**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| TAYLOR HAZEL,<br><br>Plaintiff,<br><br>v.<br><br>DISTRICT OF COLUMBIA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 23-01183 (RCL) |

## MEMORANDUM OPINION

Plaintiff Taylor Hazel, proceeding *pro se* and *in forma pauperis*, sues the Defendant the District of Columbia for damages arising from an alleged unlawful search of his vehicle by an unnamed D.C. Metropolitan Police Department ("MPD") police officer, while his vehicle was parked in a parking lot at a shopping mall. *See generally* Complaint ("Compl."), ECF No. 1-1; Amended Compl. ("Am. Compl."), ECF No. 1-4. In an earlier decision, this Court dismissed all of the claims against the District except for Hazel's common law claim for vicarious liability based on intrusion upon seclusion. *See* Memorandum Opinion & Order (Mar. 14, 2025), ECF No. 36.

Discovery on the surviving claim closed on October 6, 2025, and on November 20, 2025, the District filed a Motion for Summary Judgment ("MSJ"), ECF No. 56. On November 24, 2025, the Court entered an Order, ECF No. 57, advising Hazel to respond to the District's Motion for Summary Judgment, and advising him of the consequences of failing to respond, *see id.* at 1–3 (citing *Neal v. Kelly*, 963 F.2d 453 (D.C. Cir. 1992)). Hazel filed his Opposition ("Opp'n"), ECF No. 58, on December 5, 2025, to which the District filed its Reply, ECF No. 59, on January 16, 2026.

Upon review of both parties' briefing and the entire record, and for the reasons explained below, the District's Motion for Summary Judgment is granted.

## I. BACKGROUND

On September 14, 2022, around 2:15p.m., Hazel, who was accompanied by his Uncle, drove his Nissan Altima to Benco Shopping Center ("Benco"), located at Benning Road in Northeast Washington, D.C., near the Benning Road D.C. Metro Station. *See* Def.'s Statement of Material Facts Not in Dispute ("SMF"), ECF No. 56-1, ¶¶ 1–3; *see* MSJ Exhibit 1, Pl.'s Deposition Transcript ("Depo. Tr."), ECF No. 56-2, at 11, 22, 24, 27, 54.

Once they arrived at Benco, Hazel parked his vehicle in the shopping center parking lot, and he left the windows rolled down because it was hot outside. *See* SMF ¶ 4; Depo Tr. at 32–37, 44, 47. Upon their arrival, Hazel noticed about two police cars and about five police officers near the entrances at Benco, although police presence was not uncommon at Benco during that time period. *See* Depo Tr. at 26–29, 38–39. A solitary male mall security guard was also present. *See id.* ¶ 84–85.

After parking, Hazel and his uncle then walked into the shopping center and into America's Best Wings. *See* SMF ¶ 4; Depo Tr. at 44. While they were in America's Best Wings, Hazel looked outside through the window and noticed that one of the police officers, a white brunette female, approximately five feet, four inches, to five feet, six inches in height, walked over to his vehicle, and she then leaned in and reached into the open back window on the driver's side, searching around, even though there was nothing in his backseat. *See* SMF ¶ 8; Depo Tr. at 41, 49–56, 58, 78–79, 90.

Hazel then left America's Best Wings and went outside to confront the police officer. *See* Depo Tr. at 51. Once he confronted her, she responded that he should have rolled his windows

up. *See* SMF ¶ 10; Depo Tr. at 51–52. She then got into a vehicle driven by another police officer and they drove off. *See* Depo Tr. ¶¶ 65–66. As a result, Hazel has suffered ongoing mental distress, including a fear driving and of the police, the incident caused him to move out of the area, and it also reignited past trauma associated with his grandfather's death by a police officer. *See id.* ¶¶ 35, 67–72. On September 20, 2022, Hazel filed a complaint with the D.C. Office of Police Complaints reporting the incident. *See id.* ¶¶ 9, 60–61; Opp'n Exhibit E (Pl. Police Compl.).

The parties dispute the identity of the woman who searched Hazel's vehicle. Hazel contends that the woman was an MPD police officer. *See* Depo Tr. at 83–84. Conversely, the District contends that there were no MPD officers assigned to patrol search area ("PSA") 507, where Benco is located, on September 14, 2022, who match the description of the officer provided by Hazel. *See* SMF ¶¶ 16–18; MSJ Exhibit 2, Def.'s Second Supplemental Answer to Pl.'s Interrogatory No. 4 ("ATI No. 4"), ECF No. ?. Accordingly, the District argues that Hazel has not met his burden of proof to establish that District was involved in the incident, and without that proof, his intrusion upon seclusion claim based on respondeat superior fails as a matter of law. *See* MSJ at 4.

## II. LEGAL STANDARD

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record." Fed R. Civ. P. 56(c)(1)(A). "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary

judgment determination." *Holcomb*, 433 F.3d at 895 (quoting *Anderson*, 477 U.S. at 248). "An issue is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified." *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 297 (D.C. Cir. 1987) (per curiam). "Until the movant has met its burden, the opponent of a summary judgment motion is under no obligation to present any evidence." *Gray v. Greyhound Lines, East*, 545 F.2d 169, 174 (D.C. Cir. 1976).

In considering a motion for summary judgment, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials, and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The nonmovant's evidence must also be sufficient enough to permit a reasonable jury to find in his favor. *See Laningham v. United States Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987) (per curiam). If the nonmovant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50.

## III. DISCUSSION

As background, under the doctrine of respondeat superior, the District may be found vicariously liable for torts committed by its police officers while acting within the scope of their employment. *See Armbruster v. Frost*, 962 F. Supp. 2d 105, 116 (D.D.C. 2013) (citation and quotation omitted). Respondeat superior liability is predicated on a two-prong test requiring (1) the existence of an employer-employee relationship, and (2) alleged tortious conduct that must

occur while the employee is acting within the scope of her employment. *See Sheppard v. United States*, 640 F. Supp. 2d 29, 34 (D.D.C. 2009).

With respect to the first prong, whether an employer-employee relationship exists, "depends on the particular facts of each case." *Dist. of Columbia v. Hampton*, 666 A.2d 30, 38 (D.C. 1995) (quoting *Safeway Stores, Inc. v. Kelly*, 448 A.2d 856, 860 (D.C. 1982)) (internal quotation marks omitted). An employer-employee relationship is established through five elements: (1) the employer's selection and engagement of the employee; (2) the payment of wages; (3) the employer's power to discharge the employee; (4) the employer's power to control the employee's conduct, and; (5) whether the conduct at issue is considered part of the employer's regular business. *See Hampton*, 666 A.2d at 38 (quoting *LeGrand v. Insurance Co. of North America*, 241 A.2d 734, 735 (D.C. 1968)).

With respect to the second prong, whether the conduct of an employee is within the scope of employment, a court assesses four elements, namely, if: (1) the conduct is the kind of work the employee is intended to perform; (2) the conduct is substantially within the authorized time and space limits; (3) the conduct is actuated, at least in part, by a purpose to serve the employer, and; (4) force is intentionally used by the employee against another, the use of force is not unexpectable by the employer. *See Schecter v. Merchs. Home Delivery, Inc.*, 892 A.2d 415, 427–28 (D.C. 2006) (quoting Restatement (Second) of Agency § 228). If there is insufficient evidence from which a reasonable juror could conclude that an action was within the scope of employment, it becomes a question of law. *See Adams v. Vertex, Inc.*, No. 04-01026, 2007 WL 1020788, at *6 (D.D.C. Mar. 29, 2007) (quoting *Boykin v. Dist. of Columbia*, 484 A.2d 560, 562 (D.C. 1984)).

The District argues that Hazel has failed to evince an employer-employee relationship, and therefore, he has also failed to evince that the female officer was acting within the scope of

employment for MPD. *See* MSJ at 7–9. In other words, Hazel has not set forth sufficient evidence to establish that the woman who searched his vehicle was an MPD police officer, and without sufficient evidence that the woman was an MPD police officer, vicarious liability for the alleged intrusion upon seclusion cannot be imposed on the District because Hazel cannot prove that the District actually employed the tortfeasor. *See id.*

In support of its position, the District submits its Second Supplemental Answer to Hazel's Interrogatory Number Four, in which it attests that

> After a reasonable inquiry, based on a review of MPD's roll call sheets identifying all officers assigned to patrol PSA 507 at that time, there were no white female officers assigned to patrol PSA 507 on September 14, 2022 during the daywork tour of duty from 0600–1630 hours. The roll call sheets for the 5D Crime Suppression Team (CST) show that on September 14, 2022 there were no white female officers assigned to patrol that day. The only white female officer on the 5D CST roll call sheets for September 14, 2022 was assigned to the academy that day. Thus, after reasonably inquiry, MPD is unable to identify an officer involved in the incident as you alleged on September 14, 2022.

ATI No. 4 at 1–2. The District also searched its Records Management System ("RMS") of PSA 507 for September 14, 2022, and "it found no records of any incidents, investigations, stops, searches, or calls at the location identified during the time period." *See id.* at 2.

Hazel's evidence offered in response is largely wavering, equivocal, and speculative. Although he testified, at one point, that he was sure that the female who searched his vehicle was an MPD officer, *see* Depo Tr. at 83–84, he offers little else to support that bare statement. He did not obtain the female officer's badge number, speak to any of the other officers who were present, or ask the security guard for information about the offending officer, despite speaking with him the following day. *See id.* at 66–68, 85, 87. Throughout Hazel's deposition he repeatedly and quite generally refers to the female officer and the other officers at Benco that day as "regular

police" with "regular police cars" and "regular uniforms," and he could only vaguely remember the uniform worn by the woman. *See id.* at 75–82. He better recalled, at least in part, the uniform worn by a male police officer, but only that it included "a black vest and blue pants that match." *See id.* at 80. He described the police cars as white "with a little stripe," or perhaps a line, and the same stripe or line may have also been included on the officers' uniforms. *See id.* After providing these descriptions, he asked the District's counsel, "[t]hat's a regular police to me, I think. Right?" *See id.*

There was also some confusion over whether or not the officers could be Metro Transit (Washington Metropolitan Area Transit Authority) Police, *see id.* at 75–76, 79–84, given the location of the Metro station across the street, *see id.* at 24. Hazel testified that he did not *think* that the officers at Benco were WMATA police. *See id.* at 75.

Apart from his deposition testimony, Hazel offers an Affidavit authored by his uncle, Bobby E. Hazel, Opp'n Exhibit B, who accompanied him on the date of incident. In the Affidavit, his uncle declares that he "witness[ed] police officer[]s drive into the shopping mall, and went to a group of people located in the parking lot. While looking out the carryout window[,] he witness[ed] a[n] unknown police office[r] went to Taylor['s] car, and start searching into the car[,]" *id.* ¶ 2. He also states that, sometime thereafter, he learned that "drugs and other contrabands [are] at the mall," and he has since witnessed "District Police Officers come into the shopping mall, and sea[r]ch individuals." *See id.* ¶ 3. However, his uncle does not specify that MPD officers were at the scene on September 14, 2022, let alone that the person who searched Hazel's vehicle was an MPD officer. In fact, he refers to the officer only as "unknown," with no other identifying information whatsoever.

Hazel also offers an Affidavit authored by another witness, Gregory Williams Bey, Opp'n Exhibit C, who states that, on September 14, 2022, he went to Benco to get food and he "observed more than 4 District of Columbia Police Officers completing searches of people and cars[.]" *id.* at 1. After that, he left and went to the Metro station. *See id.* But Mr. Williams Bey does not connect these D.C. police officers to the search of Hazel's vehicle, nor does he identify the female officer in question, either as described by Hazel, or otherwise.

Simply put, the Hazel's testimony and the assertions submitted by the two affiants are too "conclusory and lacking in the necessary factual specificity" to defeat summary judgment. *See Singh v. Dist. of Columbia*, 55 F. Supp. 3d 55, 66 (D.D.C. 2014) (citing *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (explaining that "some statements are so conclusory as to come within an exception to [the] rule" that a court must accept all statements by the nonmoving party as true for purposes of summary judgment); *Akers v. Beal Bank*, 845 F. Supp. 2d 238, 243–44 (D.D.C. 2012) (explaining that "the nonmoving party . . . may not rely solely on allegations or conclusory statements. Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor") (internal citation and quotation omitted); *Lindsey v. Rice*, 524 F. Supp. 2d 55, 60 (D.D.C. 2007) (granting summary judgment when plaintiff's "self-serving statements [were] too conclusory to survive [defendant's] summary judgment motion")).

To the contrary, the District has submitted concrete evidence that, not only was there no female MPD officer by Hazel's description assigned to PSA 507 on September 14, 2022, but there were no white female MPD officers *whatsoever* assigned to PSA 507 that day. *See* ATI No. 4 at 1–2. The only PSA 507 white female officer was assigned to the academy that day, and could not have plausibly been at Benco. *See id.* Furthermore, a search of RMS revealed no reported incidents at the given date, time, and location. *See id.* at 2. Relevant here, the District "need not

submit 'affidavits or other similar materials *negating* the opponent's claim[,]'" *see Grimes v. Dist. of Columbia*, 794 F.3d 83, 93 (D.C. Cir. 2015) (citing *Celotex*, 477 U.S. at 323) (emphasis in original), though it is arguable that the District has, in fact, negated it. In any event, in pointing to the absence of evidence proffered by Hazel, the District may succeed on summary judgment. *See Celotex*, 477 U.S. at 322. The onus then shifts back to Hazel.

Although Hazel may attempt to defeat summary judgment through factual representations made sworn affidavits, he must support his allegations with facts in the record, *Greene*, 164 F.3d at 675, or provide "direct testimonial evidence," *Arrington v. United States*, 473 F.3d 329, 338 (D.C. Cir. 2006). For a court to accept anything less "would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial." *Greene*, 164 F.3d at 675.

Here, Hazel has not produced his own sworn affidavit. And because Hazel "is the plaintiff and so bears the burden of proof of h[is] claims, it is well established that []he cannot rely on the allegations of h[is] own complaint in response to a summary judgment motion, but must substantiate them with evidence." *See Grimes*, 794 F.3d at 94 (citing *Celotex*, 477 U.S. at 324) (stating that "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves"); *Bush v. Dist. of Columbia*, 595 F.3d 384, 386–87 (D.C. Cir. 2010); Fed. R. Civ. P. 11(b)(3)). Hazel relies predominantly on the allegations and denials of his pleadings, *see* Opp'n Memorandum at 3–4, 7, which he may not do, *see Anderson*, 477 U.S. at 248.

And although Hazel has submitted two other witness's affidavits, as discussed above, neither of those affidavits demonstrate that the female officer implicated by Hazel worked for MPD. Indeed, there are no facts in the record to support the officer's employment with MPD,

except for, perhaps, a portion of Hazel's deposition testimony, but that testimony cannot be described as direct, and does not constitute "evidence that a reasonable jury could credit in support" of respondeat superior. *See id.*; *Anderson*, 477 U.S. at 252 (holding that the "mere existence of a scintilla of evidence" is "insufficient" to overcome summary judgment because "there must be evidence on which the jury could reasonably find for the" non-moving party); *see also, e.g., Jackson v. Teamsters Local Union 922*, 204 F. Supp. 3d 97, 111 (D.D.C. 2016) (granting summary judgment for the defendant where the plaintiffs' "equivocal testimony [was] the only evidence in the record" offered to fulfill an essential element of their claim), *aff'd*, 697 Fed. Appx. 4 (D.C. Cir. 2017) (per curiam); *Williams v. Chertoff*, 495 F. Supp. 2d 17, 39 (D.D.C. 2007) (same); *Arrington v. Dist. of Columbia*, 597 F. Supp. 2d 52, 58, 60 (D.D.C. 2009) (finding that the plaintiff's "speculative [and] wavering" deposition testimony and his "bare assertions" at deposition and in written discovery were not enough "to counter" the defendants' stronger evidence in support of summary judgment).

Hazel has not identified the female officer or presented competent evidence to show that, contrary to the District's conclusive evidence drawn from its own records, she was employed by MPD, or even assuming *arguendo* that she worked for MPD, that she was acting within the scope of her employment at the time of the incident, thus falling short of all nine elements required to implicate the District through respondeat superior. *See Hampton*, 666 A.2d at 38 (listing required elements for employer-employee relationship); *Schecter*, 892 A.2d at 427–28 (listing required elements for scope of employment); *see also Stevens v. Sodexo, Inc.*, 846 F. Supp. 2d 119, 129 (D.D.C. 2012) (explaining that "conclusory, and conflicting, factual allegations" do not meet the "legal requirements" of a vicarious liability claim).

Indeed, courts in this jurisdiction have entered summary judgment for the moving party under similar circumstances. *See, e.g., Singh*, 55 F. Supp. 3d at 66, 68 (awarding summary judgment to the District for a vicarious liability claim, arising from alleged actions of John and Jane Doe MPD officers, where based on a review of the responding officers' badge numbers, the Doe officers could not have engaged in the alleged harassing behavior); *Okeke-VonBatten v. Greater Washington Mortg. LLC*, 766 F. Supp. 2d 43, 47 (D.D.C. 2011) (awarding summary judgment to defendant attorney where she "presented uncontested evidence that" "no employer-employee relationship existed between" her and an offending process server and therefore the attorney could not be held "vicariously liable for any violations" of the process server); *Sheppard*, 640 F. Supp. 2d at 35 (awarding summary judgment to the District on vicarious liability claim where the plaintiff failed to show that the offending police officer was acting within the scope of employment for MPD merely because "he was driving a vehicle owned by his employer and was possibly on duty[.]"); *Herbin v. Hoeffel*, 886 A.2d 507, 509–10 (D.C. 2005) (per curiam) (affirming award of summary judgment for the D.C. Public Defender Service and its Director for vicarious liability claims where the plaintiff failed to rebut their evidence that the defendant attorney's alleged tortious acts "were animated in any way by a purpose to further the business of PDS," "were foreseeable to PDS," or that "PDS had 'instructed' or 'assigned'" the attorney to represent the plaintiff "in any matter at all, or knew of any such representation she had undertaken."); *Moorehead v. Dist. of Columbia*, 747 A.2d 138, 145–46 (D.C. 2000) (affirming award of summary judgment for the District where the plaintiff argued that, because the offending police officer was not employed by the store where the precipitating event occurred, "he must be an agent of the District," but this "logic [was] flawed" because it "does not automatically follow

from the fact that" the officer was "not considered an agent of one person or entity . . . that he must be the agent of someone else (the District) who may have some authority over his actions.").

In short, Hazel feels strongly that the female officer who searched his vehicle worked for MPD, and he asks the Court to infer that, because MPD officers were sometimes present at Benco, and were likely present the day of the incident, ergo, she was an MPD officer working in the scope of her employment. But at the summary judgment stage, strong feelings and inferences are not enough; they are "merely colorable" and lack the substantial probative force required for a case to proceed to a trial. *See Anderson*, 477 U.S. at 249–50; *see also Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1032 (D.C. Cir. 1988) ("A party who bears an initial burden of production should not be permitted to waste the resources of its opponent and of the courts if it cannot show that it could possibly meet that burden."). Hazel's "metaphysical doubt as to the material facts[,]" submitted by the District is not enough to withstand the District's material evidence showing that no white female officer could have been at Benco on the date of incident. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Accordingly, the Court finds that the District cannot be held vicariously liable for the alleged intrusion upon seclusion committed by the unnamed tortfeasor.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that Hazel's evidence presents no genuine issues of material fact requiring submission to a jury, that the District of Columbia is therefore entitled to summary judgment. An accompanying Order is issued separately.

Date: 9-30-26

ROYCE C. LAMBERTH
United States District Judge